**DICKINSON STATE BANK, Appellant,**

v.

**John Wallace OGDEN et ux., Appellees.**

No. 17775.

Court of Civil Appeals of Texas,
Houston (1st Dist.).

July 2, 1981.

Rehearing Denied Sept. 17, 1981.

Krist, Gunn, Weller & Neumann, William G. Neumann, Jr., Houston, for appellant.

McConnico, Gregg & Jones, Dalton L. Jones, Dick H. Gregg, Houston, for appellees.

Before COLEMAN, C. J., and PEDEN and DOYLE, JJ.

On Motion for Re-hearing

COLEMAN, Chief Justice.

This suit arises from the breach of a construction contract wherein Alan Thayer, doing business as John Thayer Construction Company, Inc., (Thayer) agreed to build a home for John and Carol Ogden (Ogdens) on property they owned for an ultimate price of $89,380. To finance the construction of the home, Thayer received an interim loan of $66,000 from appellant, Dickinson State Bank (Bank), giving his note therefor. As security for his loan, Thayer pledged a mechanic's lien contract with power of sale and the $66,000 note.

Thayer abandoned the job before completion and the bank posted the property for sale under its mechanic's and materialman's lien. The Ogdens filed suit seeking to enjoin the sale and secured a temporary injunction. In its answer to this suit the bank sued for recovery on its note and the foreclosure of its lien. The Ogdens then amended their pleadings to include a cause of action for recovery under the Deceptive Trade Practices Act, Tex.Bus. & Com.Code Ann. § 17.41 et seq. (Vernon Supp. 1980–81).[1]

After a jury trial the court rendered judgment for the Ogdens for treble the amount of damages found by the jury reduced by the difference between the amount of the note ($66,000) and the cost to complete the contract as found by the jury. The trial court also awarded attorney's fees to the Ogdens and cancelled the lien on the Ogden property.

By its first point of error the Bank asserts that the trial court erred in overruling its motion for instructed verdict because appellees were not "consumers" as defined in the DTPA. In § 17.45(4) a consumer is defined as "an individual—who seeks or acquires by purchase or lease any goods or services." This definition was considered by the Supreme Court of Texas in *Cameron et ux. v. Terrell and Garrett, Inc.,* 618 S.W.2d 535 (1981), where the court said:

> We find no indication in the definition of consumer in section 17.45(4), or any other provision of the act, that the legislature intended to restrict its application only to deceptive trade practices committed by persons who furnish the goods or services on which the complaint is based. Nor do we find any indication that the legislature intended to restrict its application by any other similar privity requirements. In contrast, privity requirements have been dispensed with altogether in negligence suits, and, for the most part, privity requirements have also been abolished in strict liability suits. ... The Act is designed to protect consumers from any deceptive trade practice made in connection with the purchase or lease of any goods or services... To this end, we must give the Act, under the rule of liberal construction, its most comprehensive application possible without doing any violence to its terms.

> Consumer is defined in section 17.45(4) only in terms of a person's relationship to a transaction in goods or services. It does not purport to define a consumer in terms of a person's relationship to the party he is suing. Section 17.45(4) does nothing more than describe the class of persons who can bring suit for treble damages under section 17.50... It does not say who a consumer can sue, section 17.50(a)(1), the subsection under which this suit was tried, expressly stated that a consumer can bring a suit if he has been adversely affected by "the use or employment by any person of an act or practice declared to be unlawful in section 17.46."

---

1. All statutory references are to the DTPA, unless otherwise indicated.

Terrell & Garrett is a person under the Act. We, therefore, hold that a person need not seek or acquire goods or services furnished by the defendant to be a consumer as defined in the DTPA... Whether the Act should be so restricted is a matter for the legislature and not this Court. Accordingly, we hold the Camerons are consumers because they purchased the goods on which their complaint is based. (citations omitted)

■ The Ogdens purchased goods and services from Thayer. There is evidence that they were adversely affected by "the use or employment" by the Bank "of an act or practice declared to be unlawful in § 17.46." Under the holding of the Supreme Court in *Cameron* the Ogdens are consumers as that word is defined in the DTPA.

The unlawful deceptive trade practices complained of by the Ogdens and alleged to be the producing cause of their damage are:

1. Representing that an agreement confers or involves the rights, remedies or obligations which it does not have or involve, or which are prohibited by law.

2. Breach of an express or implied warranty.

3. Committing an unconscionable action or course of action.

In answers to the special issues submitted the jury found (1) that the defendant Bank represented to the Ogdens that it would protect the interim construction funds through periodic inspections and the withholding of loan funds until percentages of the completion of the house were finished; (2) that the Bank paid out the construction monies to the Alan Thayer Construction Company, Inc., without using ordinary care in making said payments; (3) that the Bank's failure to use ordinary care in making payments to the construction company was a producing cause of damages to the Ogdens; (4) that the Bank failed to use ordinary care in inspecting the work in progress on the Ogdens' house; (4a) that the Bank's failure to use ordinary care in inspecting the work in progress was a pro-

ducing cause of damages to the Ogdens; (5) that on April 9, 1979, the Bank through its agent, servant and employee or attorney began foreclosure proceedings on the builder's and mechanic's lien on the Ogdens' property at a time it did not have a right to do so; (5a) that the Bank's attempt to foreclose was a producing cause of damages to the Ogdens; (6) that the Dickinson State Bank attempted to collect the sum of $66,-000 plus interest and attorney's fees under the note and contract executed by the Ogdens on August 3, 1978, at a time when it was not due; (7) that the attempt by the Bank to collect $66,000 plus interest and attorney's fees was a producing cause of damages to the Ogdens; (8) that the reasonable cost of completing the Ogden residence in a good and workman-like manner according to the plans and specifications on or about 20 November 1978 was $38,000; (9) that the reasonable cost of completing the Ogden residence in a good and workman-like manner according to the plans and specifications on 1 May 1980 was $45,600; (10) that the Dickinson State Bank had no written notice of the Ogdens' complaint about the Bank's manner of disbursement of the interim construction funds, or the bank's manner of inspection of the Ogdens' house, before 3 April 1980.

A general damage issue was submitted by special issue number eleven reading:

What sum of money, if any, do you find from a preponderance of the evidence will compensate John and Carol Ogden for their damages, if any, as a result of the acts of the Dickinson State Bank? You are instructed you may consider the following in connection with your answer to this issue:

(a) Increases in interest costs from January 1, 1979 to date.

Answer: Zero

(b) Loss of fees paid to Guaranty Federal Savings and Loan Association.

Answer: Zero

(c) Cost to complete improvements in a good and workman-like manner according to the plans and specifications on 1 May 1980.

Answer: $45,600.

The Ogdens rely on these findings to sustain their cause of action under the Deceptive Trade Practices Act. In appellees' original brief they expressly waived recovery under a tort or negligence theory. The Bank's points of error twenty-seven through forty-two complain of the trial court's errors in submitting special issues 1 through 4a for the reason that there were no pleadings or evidence to support the submissions.

Mr. Ogden testified on direct examination that there was a discussion concerning draws at a meeting attended by Mr. Fitzpatrick and Mr. Austin of the Bank and Mr. Thayer and the Ogdens. There was also a discussion of a special account for the Alan Thayer Construction Company, Inc., for the construction of the house. Mr. Ogden gathered from the discussions that draws would be made from the proceeds of the $66,000 note and that inspections would be made.

On cross-examination Mr. Ogden testified that he made no special request of the bank in connection with the interim construction loan and that he did not inquire about the Bank procedure in such matters. He did not ask the Bank to handle the disbursement of the funds in any particular matter or to give him an accounting of the money disbursed. He recognized at that time that the relationship between the Bank and Mr. Thayer was none of his business "other than the common goal." While there is testimony that a discussion of draws and inspections was had at this meeting, there is no testimony as to the content of any agreements or representations made at that time. There is evidence of the Bank's customary practices, but there is no evidence that the Bank expressly represented that these customary practices would be followed. There is no evidence that the Ogdens knew the Bank's practices with regard to disbursements and inspections. In the absence of testimony establishing the specific representations made to the Ogdens by the Bank, there is no evidence of warranties express or implied. There is no evidence to support the jury's answer to special issue number one.

There is no evidence that the Bank breached a duty owed to the Ogdens arising from contract or from the common law arising out of their inspections of the work in progress or from the procedure adopted in permitting draws on the construction funds by the contractor. We are not persuaded that the trial court submitted the issues on negligence as a basis for a common law recovery rather than a recovery based on breach of warranty. We note that special issues numbers 3 and 4a inquire whether the negligence of the Bank was a producing cause of damages to the Ogdens (rather than a proximate cause of the damage).

The Ogdens contend that the findings of the jury in response to special issues no. 5, 5a, 6 and 7 establish a violation of § 17.-46(b)(12), a "laundry list" violation. This paragraph of § 17.46 defines the term "false, misleading, or deceptive acts or practices" to include representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law." The jury determined that the Bank attempted to foreclose and to collect the sum of $66,000 when it did not have a right to do so, and that these acts were a producing cause of damages to the Ogdens. The appellants contend that issues 5 and 6 submit to the jury a question of law. The contractor and the Ogdens executed a builder's and mechanic's lien contract with power of sale whereby the contractor agreed to construct a residence for the owners according to plans and specifications on a definitely described lot which was owned by the Ogdens. In consideration the Ogdens agreed to pay to the contractor the sum of $66,000 "on or before one hundred and twenty (120) days from date hereof subject to the completion of this contract." This was a printed form contract and the language quoted was typewritten. There was an additional paragraph in the printed form reading:

In the event that the improvements herein mentioned to be erected, fail for any reason to be completed, or fail to be com-

pleted according to the contract, or all of the labor and material used in erection thereof fail to be provided by the contractor, then contractor or other owner and holder of the herein described indebtedness and note shall have a valid and subsisting lien for said contract price, less such amount as would be reasonably necessary to complete said improvements according to said plans and specifications or in such event the owner and holder of the hereinabove mentioned indebtedness and note, at his option, shall have the right to complete said improvements, and the liens herein given shall inure to the benefit of said owner and holder.

Many of the usual provisions of a deed of trust were included in this lien instrument including the conveyance of the property to a named trustee, who was authorized in the event of default in the payment of the principal and interest of the secured note to sell the property subject to the lien at public auction to the highest bidder for cash. The instrument further provided that from the proceeds of the sale the trustee should first pay the expense of advertising the sale and making the conveyance, including a commission of 5% to himself, attorney's fees and other charges due and unpaid on said note and all other indebtedness secured by the note. It provided that the balance of the sales price, if any, would be paid to the owners. There appears to be a conflict between the typewritten provision quoted above and the language relating to the rights to the owner of the indebtedness in the event the contractor fails to complete the house in accordance with the plans and specifications.

■ In interpreting the contract it is the duty of the court to seek the intention of the parties as that intention is expressed in the written instrument. The intention of the parties is to be ascertained by a consideration of all of the provisions of the lease, and by harmonizing, if possible, those provisions which appear to be in conflict. If after established rules of interpretation have been applied, there still appears to be a conflict or an ambiguity in the provisions of the agreement and it is susceptible to two reasonable meanings, then, and only then, is the court authorized to receive extrinsic evidence to resolve the conflict or ambiguity. *McMahon v. Christmann*, 157 Tex. 403, 303 S.W.2d 341 (1957). The note which was secured by the builder's and mechanic's lien also contains the typewritten agreement that the note would be paid on or before 120 days from the date thereof subject to the completion of the contract. There is a provision that the payment of the note is secured by the lien contract and "subject to and governed by said contract, which is expressly referred to, incorporated herein and made a part hereof...."

■ The Bank contends that the typewritten language controls and that the note does not become due until the improvement is fully completed. However, a consideration of all of the provisions of the contract leads us to the conclusion that its provisions can be harmonized by finding that it was the intention of the parties as expressed in the instrument that the note would not become due in 120 days unless the improvements were completed. If the improvements were not completed on that date then the Bank could allow the contractor additional time in which to complete the improvements, or it could assert its right under the lien contract to complete the job. The final alternative would be to forego its right to foreclose under the powers given in the lien instrument and to bring suit to enforce its lien. The contract preserves a valid and subsisting lien for the contract price, less such amount as would be reasonably necessary to complete the improvements according to the plans and specifications. It does not give the owner of the note and the lien securing same the right unilaterally to determine the reasonable cost of completing the improvements, nor does it grant a right to foreclose the lien by public sale prior to the time a binding determination of the cost to complete has been reached. Prior to that time the trustee making the sale would be unable to determine how much to pay the owner of the note pursuant to his responsibility of

making disbursement of the proceeds of the sale. *Bogel v. Home Lumber Co.*, 283 S.W.2d 794 (Tex.Civ.App.—Dallas 1955, writ ref'd n. r. e.); *Farm and Home Savings and Loan Association v. Muhl*, 37 S.W.2d 316 (Tex.Civ.App.—Waco 1931, writ ref'd); *Harrop v. National Loan and Investment Co. of Detroit, Mich.*, 204 S.W. 878 (Tex.Civ. App.—Fort Worth 1918, writ ref'd).

Under this view of the contract it is established as a matter of law from the undisputed evidence that the Bank began foreclosure proceedings of the builder's and mechanic's lien on the Ogdens' property at a time when it did not have a right to do so, and also attempted to collect the sum of $66,000 plus interest and attorney's fees under the note and contract executed by the Ogdens on August 3, 1978, at a time when it was not due. The submission of special issues no. 5 and 6 to the jury was not a harmful or reversible error merely because it constituted the submission of a question of law to the jury in this instance.

The jury has also found that each attempt to foreclose was a producing cause of damages to the Ogdens. Under these findings the attempt to foreclose is a representation that the builder's and mechanic's lien contract confers or involves rights and remedies which it does not have and constitutes "false, misleading, or deceptive acts or practices" as set out in § 17.46(b)(12).[2] *Leal v. Furniture Barn, Inc.*, 571 S.W.2d 864 (Tex. 1978).

In answer to special issue no. 5 the jury found that the Bank commenced foreclosure proceedings on April 9, 1979. The Ogdens were entitled to collect such damages as were produced subsequent to that date by the deceptive trade practices. *Royal Globe Ins. Co. v. Bar Consultants*, 577 S.W.2d 689 (Tex.1979); *Garnor-Evans & Company v. Webber*, 363 S.W.2d 383 (Tex. Civ.App.—Houston 1963, writ ref. n. r. e.).

There is evidence from which the trier of fact could conclude that the Bank's insistence upon the payment of the full amount of $66,000 produced delay in the completion of the house. Both at the time the Bank made the construction loan to the contractor and at the time it acquired the $66,000 note from the contractor by foreclosure, it knew that the Ogdens expected to secure the funds with which to pay the note by borrowing money. There is evidence that the cost of borrowing money has increased substantially since the foreclosure proceedings were instituted. There is also evidence that the cost of completing the house has increased. There is evidence, therefore, to support the findings of the jury to special issues no. 5a and 7.

The entire cost of completing the improvements was not the result of the foreclosure proceeding. By purchasing the Ogden note and the lien contract securing it the Bank did not assume the obligation to make improvements on the mortgage property and, therefore, would not be liable in damages for the failure to complete the improvement. *Farm and Home Savings and Loan Association v. Muhl*, supra. This loss occurred when the builder abandoned its contract, an event which occurred prior to the beginning of the foreclosure proceedings. The cost of completing the improvements prior to the date of the deceptive act or practice found by the jury resulted from the builder's breach of contract and only the increased cost produced by the deceptive trade practice could be recovered from the Bank as actual damage by the Ogdens. *Royal Globe Ins. Company v. Bar Consultants*, supra. The trial court erred in awarding damages based on the jury's answer to special issue 11(c).

The special issues submitted to the jury do not establish the amount of increase in building costs from the date of the beginning of the foreclosure proceedings to the date of trial. While there is evidence concerning the rates of interest generally prevailing at the time of trial, the record does not establish the difference between the interest rate at the time the deceptive trade

2. The provisions of the DTPA in effect on the date the alleged deceptive act occurred, April 9, 1979, govern the disposition of this case. *Cam-* *eron v. Terrell and Garrett, Inc.*, supra. The DTPA as amended in 1977 is controlling.

practice was committed and at the time of trial. The trial court erred in disregarding the jury's answer to special issue no. 11(a) and finding as a matter of law that the answer to special issue no. 11(a) is $97,-290.17, and in thereafter rendering a judgment based on that figure.

In accordance with the mechanic's and materialman's lien contract the contractor is entitled to recover the difference between the contract price and the reasonable cost of completing the job at the time of the breach. *Farris v. Smith Erectors, Inc.*, 516 S.W.2d 281 (Tex.Civ.App.—Houston [1st Dist.] 1974, no writ); *Carras v. Birge*, 211 S.W.2d 998 (Tex.Civ.App.—Dallas 1948, writ ref'd n. r. e.). Any increased cost resulting from delay produced by a deceptive trade practice could be recovered by the Ogdens in this action.

■ By points of error 19 through 24, the Bank argues that the court erred in failing to reform the contract price to $88,050, and in failing to award interest on the amount owed on the promissory note. The note on which the Bank seeks recovery was in the amount of $66,000. The owner and the contractor both testified that the agreement between them was that the owner would pay a total sum of $88,050 to the contractor as the total consideration for building the contemplated improvements. Mr. Austin, an officer of the bank, also testified that he knew this was the agreed price. All parties also testified that extras in place at the time of the breach increased the contract price by the sum of $1,330. This increased the contract price to the amount of $89,380. This testimony constituted a judicial admission on the part of the Ogdens. The declaration relied on was made during the course of a judicial proceeding; it was contrary to an essential fact embraced in the theory of defense asserted by him; it was deliberate, clear and unequivocal and related to a fact on which judgment for the opposing party could be based. *Griffin v. Superior Insurance Company*, 161 Tex. 195, 338 S.W.2d 415 (1960).

■ A court of equity may reform a contract if it is shown that a provision agreed upon by the parties was omitted from the written instrument by mistake and that the provisions sought to be added were actually agreed upon the parties when the contract was executed. 10 Tex.Jur.2d Building Contracts § 8 (1959). Mr. Ogden testified that the $66,000 sum mentioned in the mechanic's and materialman's lien contract and the note represented the money that the Bank was to get out of the price and that he knew at the time the contract was signed that the house would cost $88,050.

■ The jury found that the cost to complete the house as of November 20, 1978, to be $38,000. The trial court subtracted this amount from the $66,000 note and allowed the Bank a net recovery of $28,000. Since the undisputed evidence shows that the contract price agreed upon between the Ogdens and the contractor was $89,380, the trial court should have deducted the $38,000 cost to complete from such an amount and, in addition, should have given the Ogdens credit for $9,000 which the evidence showed they had paid to Thayer on the total contract price. In addition the evidence shows that the Bank did not disburse the entire $66,000 loan proceeds to the contractor. This fact must also be taken into account in determining recovery of the Bank on its note.

The Supreme Court of Texas held in *Smith v. Baldwin*, 611 S.W.2d 611, 617 (Tex. 1981), in a suit based on the Deceptive Trade Practices Act, that the actual damage suffered means the net damage after allowing set-offs. The court said:

> ... The actual damages suffered under § 17.50(b)(1) are determined by the total loss sustained by the plaintiff as a result of the Deceptive Trade Practices. Allowable set-offs will necessarily reduce the actual damages and hence the sum subject to trebling.

In *Nalle v. Harrel*, 118 Tex. 149, 12 S.W.2d 550 (1929), the Court said:

> The great object of all discounts or set-offs is to adjust the indebtedness between the parties, and to permit executory process to be enforced only for the balance

that may be due. *Simpson v. Huston*, 14 Tex. 476, 481. Set-off "is the doctrine of bringing into the presence of each other the obligations of A to B and B to A and by the judicial action of the court making each obligation extinguish the other." (citations omitted)

The Court in *Nalle* further held:

In consequence, the judgment in favor of Nalle, even though affirmed, is interlocutory, and judgment in the case cannot become final until defendant's claims are finally adjudicated or given disposition otherwise. The necessary result of hold-'ing that the elements are severable so as to permit a judgment presently enforceable in one branch is to deny the right of mutual cancellation by judicial action which we say is established in our law.

 Since the Bank's cause of action on the note can be considered a "set-off", any recovery by the Bank on the note should be deducted from any recovery by the Ogdens on their cause of action under the Deceptive Trade Practices Act and only the balance remaining, if any, should be trebled. *Smith v. Baldwin*, supra. The trial court erred in allowing the Bank a net recovery of $28,000 on the Ogden note.

In their motion for rehearing the Ogdens assert that this court erred in rendering a decision in this case with only two Justices sitting on the case. Tex.Rev.Civ. Stat.Ann. art. 1812 (Vernon Supp. 1980–81), provides that the Court of Civil Appeals for the 1st Supreme Judicial District shall consist of a Chief Justice and five Associate Justices and may sit in panels of not less than three Justices. This case was heard by a panel consisting of Coleman, Chief Justice, Wallace and Doyle, Justices. After the case was submitted on oral argument Justice Wallace was elected to the Supreme Court of this State and qualified for that position before a decision was rendered in this case. The case was then decided by the remaining panel members. We consider that where a case has been submitted to a panel of three justices and a decision is rendered by two justices originally sitting on the case the judgment rendered is a valid one.

The motion for re-hearing is granted, the original opinion herein is withdrawn. The judgment of the trial court is reversed, and, in the interest of justice, the cause is remanded to the trial court.